1  Vanessa R. Waldref
   United States Attorney
2  Eastern District of Washington
   Stephanie Van Marter
3  Assistant United States Attorney
   Post Office Box 1494
4  Spokane, WA  99210-1494
   Telephone: (509) 353-2767
5



6

7
                    UNITED STATES DISTRICT COURT
8          FOR THE EASTERN DISTRICT OF WASHINGTON

9  UNITED STATES OF AMERICA,
10
                    Plaintiff,              4:21-CR-06028-MKD-7
11
12       v.                                 PLEA AGREEMENT

13  LETICIA RODRIGUEZ,
14
                    Defendant.
15

16

17       Plaintiff United States of America, by and through Vanessa R. Waldref, United

18  States Attorney for the Eastern District of Washington, and Stephanie Van Marter,

19  Assistant United States Attorney for the Eastern District of Washington, and

20  Defendant, LETICIA RODRIGUEZ ("Defendant"), both individually and by and

21  through Defendant's counsel, Nicholas Marchi, agree to the following Plea

22  Agreement:

23       1.    Guilty Plea and Maximum Statutory Penalties:

24       Defendant agrees to enter a plea of guilty to Count 1 of the Second Superseding

25  Indictment filed on March 1, 2022, charging Defendant with Conspiracy to Distribute

26  50 Grams or More of Actual (Pure) Methamphetamine, 400 Grams or More of

27  Fentanyl, and 5 Kilograms or More of Cocaine, all Schedule II controlled substances,

28  in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi) and (viii), and § 846.

PLEA AGREEMENT - 1

Defendant understands that the following potential penalties apply:

    a.    a term of imprisonment of not less than 10 years no more than life;

    b.    a term of supervised release of not less than 5 years and up to a lifetime;

    c.    a fine of up to $10,000,000;

    d.    denial of federal benefits; and

    e.    a $100 special penalty assessment.

2.    <u>Supervised Release</u>

Defendant understands that if Defendant violates any condition of Defendant's supervised release, the Court may revoke Defendant's term of supervised release, and require Defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on post-release supervision, up to the following terms:

    a.    5 years in prison if the offense that resulted in the term of Supervised Release is a class A felony,

    b.    3 years in prison if the offense that resulted in the term of Supervised Release is a class B felony, and/or

    c.    2 years in prison if the offense that resulted in the term of Supervised Release is a class C felony.

Accordingly, Defendant understands that if Defendant commits one or more violations of supervised release, Defendant could serve a total term of incarceration greater than the maximum sentence authorized by statute for Defendant's offense or offenses of conviction.

3.    <u>Denial of Federal Benefits:</u>

Defendant understands that by entering this plea of guilty, Defendant is no longer eligible for assistance under any state program funded under part A of Title IV of the Social Security Act (concerning Temporary Assistance for Needy Families) or

PLEA AGREEMENT - 2

benefits under the food stamp program or any state program carried out under the Food Stamp Act. 21 U.S.C. § 862a. Defendant also understands that the Court may deny Defendant's eligibility for any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States. 21 U.S.C. § 862.

4.    Potential Immigration Consequences of Guilty Plea

If Defendant is not a citizen of the United States, Defendant understands the following:

        a.    pleading guilty in this case may have immigration consequences;

        b.    a broad range of federal crimes may result in Defendant's removal from the United States, including the offense to which Defendant is pleading guilty;

        c.    removal from the United States and other immigration consequences are the subject of separate proceedings; and

        d.    no one, including Defendant's attorney or the Court, can predict with absolute certainty the effect of a federal conviction on Defendant's immigration status.

Defendant affirms that Defendant is knowingly, intelligently, and voluntarily pleading guilty as set forth in this Plea Agreement, regardless of any immigration consequences that Defendant's guilty plea may entail.

5.    The Court is Not a Party to the Plea Agreement:

The Court is not a party to this Plea Agreement and may accept or reject it. Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter.

Defendant understands the following:

        a.    sentencing is a matter solely within the discretion of the Court;

        b.    the Court is under no obligation to accept any recommendations made by the United States or Defendant;

PLEA AGREEMENT - 3

     c.     the Court will obtain an independent report and sentencing recommendation from the United States Probation Office;

     d.     the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties;

     e.     the Court is required to consider the applicable range set forth in the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances; and

     f.     the Court may reject recommendations made by the United States or Defendant, and that will not be a basis for Defendant to withdraw from this Plea Agreement or Defendant's guilty plea.

6.     <u>Waiver of Constitutional Rights</u>:

Defendant understands that by entering this plea of guilty Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

     (a).     The right to a jury trial;

     (b).     The right to see, hear and question the witnesses;

     (c).     The right to remain silent at trial;

     (d).     The right to testify at trial; and

     (e).     The right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands Defendant retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if Defendant cannot afford to hire an attorney.

Defendant understands and agrees that any defense motions currently pending before the Court are mooted by this Plea Agreement, and Defendant expressly waives Defendant's right to bring any additional pretrial motions.

7.     <u>Elements of the Offense</u>:

The United States and Defendant agree that in order to convict Defendant of Count 1, the United States would have to prove beyond a reasonable doubt the

PLEA AGREEMENT - 4

following elements:

> *First*, on a date unknown but by May 2021 and continuing until on or
> about August 3, 2021, in the Eastern District of Washington, Defendant,
> LETICIA RODRIGUEZ, entered into an agreement with one or more
> persons to commit the crime of Distribution of Methamphetamine,
> Fentanyl and Cocaine, as charged in the Second Superseding Indictment;
> *Second*, Defendant became a member of the conspiracy knowing of at
> least one of its objects and intending to help accomplish it; and
> *Third,* the agreement was to distribute 50 Grams or More of Actual
> (pure) Methamphetamine, 400 grams or more of Fentanyl and/or 5
> Kilograms of Cocaine, which would be reasonably foreseeable to
> Defendant as a member of the conspiracy.

8.    <u>Statement of Facts</u>:

The United States and Defendant stipulate and agree to the following: the facts set forth below are accurate; the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis for Defendant's guilty plea.

The United States and Defendant agree that this statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts that are relevant to the Sentencing Guidelines computation or sentencing, unless otherwise prohibited in this Plea Agreement.  The parties further agree and stipulate that this factual basis is simply a summary to support the plea, it does not contain all facts which could be proven by the United States.

On November 27, 2019, DEA Seattle along with the assistance of DEA Tri-Cities, conducted an interdiction stop of Juan MEJIA. As a result of that contact, two kilograms of cocaine were located and seized. Prior to the interdiction stop, DEA Tri-Cities agents observed MEJIA meet with an unidentified Hispanic male in Kennewick, WA, at a suspected job site. Three white trucks with the words

PLEA AGREEMENT - 5

"Affordable Landscaping" on the side were observed at the location.  During the transaction with the unidentified Hispanic male, MEJIA retrieved a gray shopping bag from inside one of the Affordable Landscaping trucks and proceeded to place it in his vehicle, before departing back toward Seattle. A subsequent interdiction stop was conducted which resulted in the drug seizure.

DEA Seattle initiated an investigation into multiple members of the Affordable Landscaping business and drug trafficking organization including Tri-Cities, WA based co-Defendant Oscar CHAVEZ and Zoe Abigail CHAVEZ.  The information from the Seattle investigation was referred to DEA Tri-Cities for further investigation. However, after the arrest of MEIJA, aside from surveillance, DEA Tri-Cities did not have an avenue into this organization until the utilization of a confidential source (CS)[1], who was introduced to the DTO through a third party, and information developed through a Source of Information (SOI).

On February 23, 2021, Special Agent (SA) Jerel Deitering met with Benton County Sheriff's Office Sergeant Horacio Gonzalez. Sergeant Gonzalez explained to SA Deitering that the information was passed on to him by a Source of Information (SOI) who wished to remain anonymous for fear of retribution. The SOI had observed a story in the local news about fentanyl overdoses in the area and felt compelled to notify authorities about what the SOI knew. The SOI was reported to have witnessed

---

[1] The CS is working for monetary compensation and has been providing information and working with DEA since July 2019. The CS has no known felony convictions but does have one misdemeanor conviction that does not appear to involve dishonesty. The CS was previously charged with False Claim to Citizenship while attempting entry into the United States through a United States Port of Entry, which resulted in an Expedited Removal in 2011. The CS is in the United States unlawfully but was granted Deferred Action by the United States Immigration and Customs Enforcement for one (1) year during his/her cooperation with DEA. DEA has been able to corroborate information provided by the DEA CS and believes the DEA CS to be credible and reliable.

PLEA AGREEMENT - 6

seeing blue pills (which the SOI suspected to contain fentanyl) in possession of at least one of the individuals described below.

The SOI stated that Oscar CHAVEZ (O-CHAVEZ), worked for Affordable Landscaping but was believed to be running a Drug Trafficking Organization (DTO) in the TriCities area. The SOI reported that O-CHAVEZ was known to travel to Tucson, Arizona to pick-up drugs and would normally be gone for three to four days at a time. The SOI stated that O-CHAVEZ is married to Zoe CHAVEZ. The SOI described several vehicles utilized O-CHAVEZ to include a white Dodge truck (WA/C27940A) and a sport utility vehicle (WA/BUG4578). SA Deitering queried said license plates through law enforcement databases which returned as follows: WA/C27940A: 2006 Dodge Ram 1500, RO: Ricardo ESPINOZA-CHAVEZ at 409 Benham Street Apt #1, Richland, WA. WA/BUG4578: 2019 Dodge Durango white, Zoe Abigail CHAVEZ at 3829 W. Kennewick Avenue, Kennewick, WA.

The SOI further named several individuals whom the SOI knew to be involved with the DTO in trafficking narcotics, to include Joel CHAVEZ-DURAN, Defendant. The SOI stated that O-CHAVEZ is related to a member of the DTO operating out of Mexico. The SOI further advised that the DTO picked up drugs in Tucson, Arizona and that they have distribution operations in Moses Lake, Yakima, and Tri-Cities, areas of Eastern Washington.

## CURRENT INVESTIGATION

In May 2021, TFO Pitts received information from a DEA CS pertaining to the Co-Defendant, Jose MENDOZA-RUELAS (MENDOZA-RUELAS) and associates involved in trafficking of methamphetamine and fentanyl laced pills in the Tri-Cities, WA area. The CS was introduced into this organization though a third party (hereafter referred to as Subject #1) who ultimately put the CS into contact with MENDOZA-RUELAS.

On May 11, 2021, the CS contacted TFO Pitts and advised that Subject #1 would be meeting with the CS at a pre-determined location (PDL) in Richland, WA.

PLEA AGREEMENT - 7

On said date at approximately 8:00pm, the CS contacted TFO Pitts and advised he/she had met with Subject #1 who was accompanied by a Hispanic male later identified as MENDOZA-RUELAS. The CS provided a photograph he/she obtained of the vehicle both subjects arrived in as well as a group photograph of both subjects during the meeting. The CS further advised that Subject #1 arrived as a passenger in a black colored Chevrolet Silverado (referred to as TARGET VEHICLE 1) being driven by MENDOZA-RUELAS. When both subjects got out of the vehicle, the CS questioned why both were there and who the boss was. MENDOZA-RUELAS advised the CS he was the boss of the two, but the CS could reach out to either, to arrange a drug purchase.

According to the CS, MENDOZA-RUELAS stated he had ten pounds of methamphetamine allotted to him at a time and when he sells it, he is given another ten. The CS was also advised by MENDOZA-RUELAS that he sold pills (fentanyl). The CS asked MENDOZA-RUELAS about ordering up bigger quantities and MENDOZA-RUELAS replied it was no problem, but he would need an extra couple of days. MENDOZA-RUELAS set the price for one pound of methamphetamine at $3,000 and $6 per pill (fentanyl). MENDOZA-RUELAS advised the CS that he acquired the methamphetamine and pills (fentanyl laced) directly from Mexico. During the meeting, MENDOZA-RUELAS provided his cellular phone number to the CS: (509) 942-4674 (herein referred to as "Target Telephone 1" or TT1[2]).
//

---

[2] A return of administrative subpoena for TT1 showed the billing party as MENDOZA-RUELAS at 110 Babs Ave. Benton City, WA (referred to later as Target Residence 2). The activation date was listed as March 17, 2020, with listed user and financial party as Azucena Duarte at 110 Babs Ave. Benton City, WA (Target Residence 2).

PLEA AGREEMENT - 8

CONTROLLED BUY #1

On May 17, 2021, TFO Pitts contacted the CS and asked the CS to arrange a purchase of one pound of methamphetamine and a sample pack of one hundred pills (fentanyl) to occur on May 18, 2021. At approximately 7:11pm, the CS contacted MENDOZA-RUELAS on TT1. During the conversation, which was in Spanish, the CS asked MENDOZA-RUELAS for one pound of methamphetamine and a sample pack of one hundred pills (fentanyl) to which MENDOZA-RUELAS replied, yes. The CS used code words previously discussed with MENDOZA-RUELAS to describe the specific drugs. The CS arranged to meet MENDOZA-RUELAS for the purchase the following day. TFO Pitts listened to the recorded conversation live.

On May 18, 2021, MENDOZA-RUELAS delivered the agreed upon one pound of methamphetamine and approximately 250 pills to the CS.  MENDOZA-RUELAS told the CS that he had talked to his boss and could supply the CS twenty plus pounds of (methamphetamine) if the CS wanted. The CS asked MENDOZA-RUELAS about his boss and learned that MENDOZA-RUELAS has known the boss for about eight years, and they were pretty "heavy" (major suppliers). MENDOZA-RUELAS told the CS that the main boss owns a landscaping business, and the nephew of the owner runs the landscaping company as a cover for the drug business (referring to O-CHAVEZ). MENDOZA-RUELAS advised they could supply methamphetamine, pills (fentanyl) and cocaine.  The CS paid the $3,600 for the methamphetamine and pills (fentanyl).

MENDOZA-RUELAS was followed from the PDL to 3829 W. Kennewick Ave. Kennewick, WA (Affordable Landscaping Compound with TARGET RESIDENCES 3, 4, and 5). SA Deitering advised TFO Pitts that he recognized the location as an area associated with Affordable Landscaping and where he had previously conducted surveillance on behalf of DEA Seattle to assist in their investigation. Agents also observed MENDOZA-RUELAS meet with a subject later identified as O-CHAVEZ.  MENDOZA RUELAS left the compound and was observed traveling back to his residence (referred to as TARGET RESIDENCE 1).

PLEA AGREEMENT - 9

On May 24, 2021, TFO Pitts applied for a Federal Search Warrant for the placement of a GPS tracking device for TARGET VEHICLE 1 (vehicle utilized by MENODZA-RUELAS). On the same date, Honorable Federal Magistrate Mary K. Dimke granted the Warrant for the installation and monitoring of the GPS tracking device (21mj07112). TFO Pitts had also applied for and obtained a GPS Tacking Warrant for TT1 also signed by the Honorable Judge Dimke. (21mj07111). The Tracker was installed the following day on TARGET VEHICLE 1.

CONTROLLED BUY #2

On June 7, 2021, TFO Pitts asked the CS to arrange a purchase of one pound of methamphetamine from MENDOZA-RUELAS to occur the following day. On said date, the CS contacted MENDOZA-RUELAS on TT1 and arranged the purchase. During the recorded telephonic negotiations, the CS advised TFO Pitts that when he/she arranged the one-pound purchase, MENDOZA-RUELAS told the CS he had two pounds left and wanted to get rid of both so he could acquire another load. Under the direction of TFO Pitts and during a subsequent recorded conversation, the CS negotiated with MENDOZA-RUELAS to purchase one pound of methamphetamine and to acquire the second on a "front." TFO Pitts later listened to the recorded conversations and found them consistent to what the CS had reported.

On June 8, 2021, MENDOZA RUELAS met with the CS, after having first met with a subject who delivered the suspected methamphetamine from a black Ford Edge bearing Washington license plate BUG3081 (TARGET VEHICLE 2). MENDOZA RUELAS was observed traveling to the PDL at which time TFO Pitts observed, through the live-feed audio/video, MENDOZA-RUELAS retrieve a white plastic tube-shaped package from a gray/black backpack and hand it to the CS. This appeared to be and matched the same package MENDOZA-RUELAS retrieved from TARGET VEHICLE 2. At approximately 5:16pm, TFO Pitts observed MENDOZA-RUELAS exit the deal location and approach TARGET VEHICLE 1. Surveillance followed MENDOZA-RUELAS back to TARGET RESIDENCE 1. During the follow back to

PLEA AGREEMENT - 10

his residence, MENDOZA-RUELAS was observed making abrupt change in travel direction and varying travel speed, indicating to surveillance MENDOZA-RUELAS may have been conducting surveillance detection maneuvers.

Meanwhile back at the deal location, TFO Pitts and TFO Orth met with the CS and retrieved the white plastic tube-shaped package of suspected methamphetamine. The CS advised that MENDOZA-RUELAS only brought one pound of methamphetamine and not the pre-negotiated two pounds. MENDOZA-RUELAS again discussed the DTO and stated he did not have a boss and is well "hooked up" with a person in Mexico. MENDOZA-RUELAS said he contacts a guy in Mexico to order drugs who in turn coordinates with his nephew who operates the landscaping company (referring to O-CHAVEZ). The Mexico subject sends "dope" to O-CHAVEZ who distributes to MENDOZA-RUELAS. The CS paid MENDOZA-RUELAS the money for the pound of methamphetamine received and the outstanding debt for the extra pills received during the previous deal.

Between controlled buy #2 and the end of June, DEA conducted surveillance of O-CHAVEZ, MENDOZA-RUELAS, other members of this DTO and TARGET RESIDENCES 1-5. The activity observed was consistent with ongoing drug trafficking activities.

On June 25, 2021 at approximately 11:12am, MENDOZA-RUELAS and the CS exchanged several SMS messages following which the CS called MENDOZA-RUELAS. TFO Pitts listened to the call which was in Spanish. During the recorded phone call, the CS began negotiations with MENDOZA-RUELAS to purchase an undetermined amount of pills (fentanyl) to occur the following week. MENDOZA-RUELAS told the CS that they were ready and to just let them know. The CS asked MENDOZA-RUELAS if the (pills) were in-hand or if he had to go and get them from the (organization) to which MENDOZA-RUELAS said they were in-hand and were from the same (organization). MENDOZA-RUELAS further said that just yesterday

PLEA AGREEMENT - 11

(June 24, 2021) they received a 'very good order' of pills and methamphetamine. The CS and MENDOZA-RUELAS agreed to meet the following week.

CONTROLLED BUY #3

On June 29, 2021, TFO Pitts asked the CS to contact MENDOZA-RUELAS and arrange a purchase of one thousand pills (fentanyl) and attempt to negotiate the price to $5.00 a pill. At approximately 11:00am, prior to contacting MENDOZA-RUELAS, surveillance units were positioned near MENDOZA-RUELAS' identified residences: 1010 Smith Ave. Richland, WA (TARGET RESIDENCE 1) and 110 Babs Ave, Space #38, Benton City, WA (TARGET RESIDENCE 2). Additionally, surveillance units were positioned near the suspected base operations for the organization: 3829 West Kennewick Ave, Kennewick, WA (TARGET RESIDENCES 3, 4, and 5).

At 1:05pm, Det. Ward observed a red Toyota Corolla (TARGET VEHICLE 3) arrive at the PDL in Richland, WA where the CS was waiting. At 1:06pm, Det. Ward advised that MENDOZA-RUELAS exited TARGET VEHICLE 3 and entered the PDL. While monitoring the live audio and video feed of inside the deal location, TFO Pitts observed MENDOZA-RUELAS enter and meet with the CS and at 1:17pm, the deal was done.

Meanwhile back at the PDL, TFO Pitts and TFO Orth met with the CS. TFO Pitts observed a brown bag containing four packages of light blue pills lying on the table which he secured. The CS advised MENDOZA-RUELAS told the CS that he received a big load last week which consisted of thirty pounds of methamphetamine. Since receiving the thirty pounds of methamphetamine, MENDOZA-RUELAS stated he sold ten pounds and had twenty pounds left. MENDOZA-RUELAS pressured the CS to help him sell the remaining amount. The CS negotiated with MENDOZA-RUELAS to make a bigger purchase in about two weeks. MENDOZA-RUELAS said they also had 60,000 pills (fentanyl). The CS paid MENDOZA-RUELAS $5,000.00 for the 1,000 pills (fentanyl). As MENDOZA-RUELAS was getting ready to leave, he

PLEA AGREEMENT - 12

mentioned to the CS that he would be paying the person who provided the product (methamphetamine/fentanyl) to him in about one month. The CS told MENDOZA-RUELAS that he/she will give him a weeks' notice before ordering a big load.

Since the initial installation of the GPS tracking device on TARGET VEHICLE 1, TFO Pitts has monitored the data and conducted periodic surveillance of MENDOZA-RUELAS and TARGET RESIDENCES 1-5. The activity surveilled involved MENDOZA-RUELAS, O-CHAVEZ and other members of this DTO to include a subject identified as Co-Defendant Carlos RUELAS-Valdovinos (hereafter C-RUELAS)[3]. The observations were consistent with ongoing drug related activities.

On July 6, 2021, TFO Pitts contacted Benton County Sergeant Horacio Gonzalez regarding the SOI that had previously reported on various subjects in this investigation. The SOI advised that 'they' (members of the organization) have been real paranoid and careful because law enforcement has been arresting people lately for drug trafficking. More specifically, the SOI advised that law enforcement arrested a subject in possession of one thousand pills (fentanyl) a couple weeks ago in Kennewick and the organization was worried the subject was going to cooperate with law enforcement. Sgt. Gonzalez showed the SOI Washington Department of Licensing photographs of multiple subjects involved in this investigation. The SOI identified who was living in which residences at the compound (TARGET RESIDENCES 3, 4 and 5).

On July 10, 2021, TFO Pitts instructed the CS to contact MENDOZA-RUELAS on July 11, 2021 and negotiate the larger purchase of methamphetamine as well as pills (fentanyl). On July 11, 2021, the CS contacted MENDOZA-RUELAS and arranged to purchase thirty-five pounds of methamphetamine. MENDOZA-RUELAS said that it was no problem and would contact his guy to place the order tonight or

---

[3] In March of 2021, a Tri-City METRO Confidential Informant identified C-RUELAS as distributing large amounts of pills (fentanyl) and had purchased these pills (fentanyl) from C-RUELAS in the past.

PLEA AGREEMENT - 13

tomorrow (July 12, 2021).

Surveillance was conducted on July 12, 2021 and agents observed O-CHAVEZ and MENDOZA RUELAS meet at the Affordable Landscaping compound. Shortly after they met, MENDOZA-RUELAS contacted the CS from TT1. TFO Pitts listened to the recorded call which was in Spanish. MENDOZA-RUELAS advised the CS he only had eight pounds of methamphetamine and about 45,000 fentanyl pills. MENDOZA-RUELAS advised the CS that a load was supposed to arrive the following week around July 22, 2021. The CS and MENDOZA-RUELAS discussed purchasing just the eight pounds. The CS advised MENDOZA-RUELAS he would contact him back.

During the afternoon of July 12, 2021, the CS and MENDOZA-RUELAS exchanged several recorded calls and continued negotiations regarding the impending deal. MENDOZA-RUELAS pressured the CS to purchase the remaining eight pounds of methamphetamine so he could acquire more. MENDOZA-RUELAS also advised the CS he was working on putting together the order and would contact the CS.  On that same day, at approximately 7:44pm, TFO Pitts was contacted by Benton County Sheriff's Sergeant Horacio Gonzalez and who provided TFO Pitts information he had just received from the SOI. The SOI reported that O-CHAVEZ had collected money from a relative's residence on Friday because the 'lady' went down to bring back more 'merchandise' (narcotics). The SOI believed the 'lady' left on Friday night and was expected to be back soon. The SOI said the trip usually would take four days.

On July 13, 2021, the CS and MENDOZA-RUELAS exchanged several recorded calls. MENDOZA-RUELAS advised the CS that he had placed the order and sent his driver down to pick up thirty pounds of methamphetamine ordered by the CS and would be back Thursday rather than next week. The requested pills by CS were also confirmed by CS throughout the recorded conversations. Per TFO Pitts' instruction, the CS attempted to delay the impending deal until the following week, but MENDOZA-RUELAS was adamant about conducting the deal on Friday (July 16,

PLEA AGREEMENT - 14

2021). MENDOZA-RUELAS advised the CS that he needed to get the money to the source and would be in trouble if he waited until next week. Furthermore, MENDOZA-RUELAS advised the CS he didn't want to hold the 'dope' all weekend. The CS also confirmed that the methamphetamine was ordered from the same organization.

EXECUTION OF SEARCH WARRANTS

On July 14, 2021, TFO Pitts applied for and obtained Federal Search Warrants for the following residences associated with the DTO: 3829 West Kennewick Ave., Kennewick, WA (TARGET RESIDENCE 3), 3829 West Kennewick Ave, #A, Kennewick, WA (TARGET RESIDENCE 4), 3829 West Kennewick Ave, #1/2, Kennewick, WA (TAREGT RESIDENCE 5), 1010 Smith Ave, Richland, WA (TARGET RESIDENCE 1), and 110 Babs Ave, Space #38, Benton City, WA (TARGET RESIDENCE 2).

Leading up to July 16, 2021, the CS had continued recorded negotiations with MENDOZA-RUELAS for the purchase of thirty to thirty-five pounds of methamphetamine and five thousand pills (fentanyl) to occur on July 16, 2021. The CS had learned through said communications that MENDOZA-RUELAS was expected to receive the requested narcotics from the DTO prior to the pre-arranged deal.

On July 16, 2021, DEA Tri-Cities with the assistance of Tri-City METRO Drug Task Force and CBP Air, initiated surveillance near one of MENDOZA-RUELAS's identified residences: 110 Babs Ave, Space #38, Benton City, WA. At approximately 9:40am, TFO Pitts instructed the CS to contact MENDOZA-RUELAS and ascertain whether he had received the requested amount of methamphetamine and pills (fentanyl).  During the recorded call, the CS asked in code if MENDOZA-RUELAS still needed to go and pick up the drugs or whether he still needed to get them. MENDOZA-RUELAS advised the CS that they were already here and ready.

PLEA AGREEMENT - 15

MENDOZA-RUELAS told the CS he was going do something and would meet with the CS.

At approximately 10:15am, surveillance observed MENDOZA-RUELAS's black Chevrolet Silverado exit the Green Acres Trailer Park (110 Babs Ave. Benton City, WA). As the vehicle was departing, Detective Miguel Ayala identified the sole occupant and driver to be MENDOZA-RUELAS. Once it appeared MENDOZA-RUELAS was traveling towards the PDL in Richland, WA, TFO Pitts asked Det. Tyler McMullen with the Kennewick Police Department, Det. Matt Griffin with the Pasco Police Department and DEA TFO Slocombe to execute a vehicle stop pursuant to an arrest warrant for MENDOZA-RUELAS (4:21-CR-6028-SMJ-1) and to execute the search warrant for the Chevrolet Silverado (4:21-mj-0758-MKD). MENDOZA-RUELAS was arrested without incident.

During the search of the Chevrolet Silverado by TFO Slocombe, no drugs were located. TFO Slocombe located and seized multiple cell phones that were later downloaded pursuant to a search warrant.

At approximately 10:20 a.m., DEA Spokane with the assistance of FBI Richland, executed Federal search warrant (4:21-mj-07153) at 1010 Smith Avenue, Richland, WA.  As agents cleared the residence, agents found one male occupant inside. The male, identified as Jeremy DUARTE, exited the rear left bedroom "D", and complied with agent commands. J-DUARTE was removed from the residence and temporarily detained for agent safety during the execution of the search warrant. While other agents searched the residence, SA D'Aquila spoke with J-DUARTE. J-DUARTE stated to SA D'Aquila that bedroom "D" he came out of belonged to his father, Pedro, while the other bedroom "E" belonged to his uncle, Jose (MENDOZA-RUELAS). At the time agents searched the residence, bedroom "E" was locked and had to be breached.

During the search of bedroom "E", MENDOZA-RUELAS' bedroom, agents located an unloaded Sundance Industries pistol found under the pillow on the bed with

PLEA AGREEMENT - 16

five rounds of ammunition along with a cellular phone. A black and silver Digi Weigh digital scale was also found in the filing cabinet drawer.

At approximately 11:02am, the DEA Tri-Cities along with the assistance of multiple Federal, State, and local law enforcement agencies executed three Federal search warrants at the compound located at 3829 West Kennewick Ave, Kennewick, WA (TARGET RESIDENCES 3, 4, AND 5), the property associated with Affordable Landscaping.

Upon entering the property, law enforcement encountered O-CHAVEZ seated in the driver's seat of his white Dodge Ram with the vehicle running. O-CHAVEZ followed law enforcement commands and exited the vehicle and was detained. While GS Savage searched O-CHAVEZ, he located a cell phone in the right front pocket of his pants.

Upon execution of the search warrant at 3929 West Kennewick Ave, Kennewick, WA (TARGET RESIDENCE 3), law enforcement knocked and announced at which time Zoe Abigail CHAVEZ came to the door and was detained. Inside the residence, law enforcement also encountered two adolescent males. A subsequent search of the residence resulted in the identification of a large amount of US currency hidden inside an incorporated part of the closet shelving. The way in which the money was secreted as well as how it was separated by rubber bands is consistent with drug cash proceeds from drug trafficking. An official count was conducted of the U.S. currency seized which totaled $152,094.00. An additional $9,575.00 was in a black sunglasses case found in a desk drawer in basement.

Inside the same residence, agents also located and seized an unloaded 45 caliber pistol and a digital money counter. TFO Pitts was advised that Border Patrol K-9 Agent Terry Louck had conducted a K-9 sniff inside the residence. Agent Louck advised that his partner, K-9 Keny, had alerted on the dresser in the O-CHAVEZ's master bedroom as well as a suitcase and storage bins in the basement. A subsequent search did not result in the seizure of any suspected narcotics.

PLEA AGREEMENT - 17

Upon execution of the search warrant at 3929 West Kennewick Ave, #A, Kennewick, WA (TARGET RESIDENCE 4), law enforcement knocked and announced and while doing so the front door partially opened. Law enforcement encountered Roberto ESPINOZA-Chavez emerging from a segregated bedroom to left upon entering. Roberto ESPINOZA-Chavez was detained, and a subsequent search resulted in the discovery of a cellular phone. A subsequent search of the upper-level residence resulted in the seizure of two loaded assault style rifles hanging on the wall in the bedroom area where Roberto ESPINOZA-Chavez emerged from, packaging material consistent with street level drug sales. A total of $5,140.00 was in the dresser drawer of the basement bedroom. Also located in a different drawer in the same bedroom was numerous money order receipts.

During a search of the basement of 3829 West Kennewick Ave, #A, Kennewick, WA (TARGET RESIDENCE 4), law enforcement located and seized multiple money order receipts and additional packaging material. Pasco K-9 Police Officer Richard Leininger performed a free air sniff for narcotics utilizing his partner K-9 Zudor inside the upstairs and basement of 3829 West Kennewick Ave, #A, Kennewick, WA. K-9 Zudor casted alerts indicating there was narcotic odor present in the air in the upper level. Additionally, K-9 Zudor alerted to a zipper seam of a suitcase located in the closet of the back bedroom. TFO Pitts was advised that K-9 Zudor showed a change of behavior on a black mini fridge located in the basement but did not give a final alert. A subsequent search did not result in the seizure of any suspected narcotics.

Based upon TFO Pitts' knowledge of this investigation, the K9 alerts on the suitcases in both 3829 West Kennewick Ave, Kennewick, WA and 3829 West Kennewick Ave, #A, Kennewick, WA, and the large bins in the basement are consistent with the previously identified and discussed drug shipments that were processed by the DTO at these locations.

PLEA AGREEMENT - 18

Upon execution of the search warrant at 3929 West Kennewick Ave, #1/2, Kennewick, WA (TARGET REISDENCE 5), law enforcement knocked and announced at which time Amelia ESPINOZA was encountered and detained. TFO Pitts was advised that nothing of evidentiary evidence located inside this location.

On July 20, 2021, TFO Pitts applied for and obtained Federal Search Warrants for O-CHAVEZ's white 2006 Dodge Ram bearing Washington license plate C12119P (4:21-mj-07161-MKD) as well as a white 2020 Dodge Ram bearing Washington license plate C59824T (4:21-mj-07162-MKD).

During the search of the 2006 Dodge Ram (the vehicle O-CHAVEZ was in), TFO Pitts located and seized another cell phone on the front passenger seat. Furthermore, next to the Samsung cell phone, TFO Pitts located and seized a black leather calendar notebook on the front passenger seat. While searching the center console area, TFO Pitts removed a detachable piece of the center console and located hidden underneath, were multiple plastic bags with residue consistent with drug trafficking. TFO Pitts also located a money order receipt and other dominion and control paperwork.

Approximately one week after the execution of search warrants, TFO Pitts was investigating where the shipment of narcotics promised to the CS may have gone. While conducting surveillance, TFO Pitts observed TARGET VEHICLE 2 arrive at the compound, driven by a then unknown subject. The driver was later confirmed to be Co-Defendant Joel CHAVEZ DURAN. There was a federal search warrant for that vehicle that had not yet been executed. As a result, the vehicle was followed and ultimately pulled over to execute the warrant. CHAVEZ DURAN was contacted as the driver and sole occupant of the vehicle. During the contact. CHAVEZ DURAN was advised the vehicle was going to be seized to effectuate the search warrant. CHAVEZ DURAN asked to be given a ride to another location. To provide him a ride, he was advised he would have to be searched before getting into a patrol car. Defendant told officers that he had 2,000 pills in his pocket. At this point, CHAVEZ

PLEA AGREEMENT - 19

DURAN was placed into custody and a subsequent search incident to arrest was conducted which resulted in the discovery of four plastic bags of light blue pills suspected to be laced with fentanyl. TFO Pitts also seized a Black Cricket Alcatel cellular phone with no identifiable that was in his possession. TFO Pitts advised CHAVEZ DURAN that he was under arrest and subsequently transported to the Pasco Police Department.

At approximately 5:53pm, TFO Pitts provided CHAVEZ DURAN with a waiver of rights form (DEA Form 13) in the Spanish language and read each of line, verbatim, to Defendant which was witnessed by Det. Eddie Magana. CHAVEZ DURAN waived said rights by signing Waiver of Rights Form DEA-13 which was also witnessed by Det. Magana. TFO Pitts and Det. Magana conducted an interview with Defendant in the Spanish language. In summary, CHAVEZ DURAN admitted to obtaining the 2,000 pills earlier that day and was on his way to deliver them to another person when he was pulled over.

That same day, GS SA Savage, SA Mitchell and TFO Pitts executed the Federal Search Warrant (4:21-mj-07159-MKD) for the black Ford Edge. During the search of the vehicle, multiple documents were located and seized. These documents included several money wire transfer receipts, vehicle registration, Walmart receipt and a Spectrum bill.

FOLLOW UP INVESTIGATION AND IDENTIFICATION OF DEFENDANT

The United States would present further evidence that upon the search of multiple cellular phones seized during this investigation, a volume of text messages, videos and pictures were identified which corroborates the level of drug trafficking involved with this DTO. O-CHAVEZ, CHAVEZ DURAN, and other members of this DTO were receiving regular drug shipments (monthly and bi-monthly) from Mexico that contained upwards of 30 to 50 pounds of methamphetamine and cocaine and over 30,000 fentanyl laced pills per shipment over the time of the conspiracy. Defendant, Leticia RODRIGUEZ was identified as one of several drivers that would transport

PLEA AGREEMENT - 20

bulk cash currency to Arizona and California and return with large quantities of cocaine, counterfeit oxy-codone pills (fentanyl) and methamphetamine.

The evidence further established that during each trip, the drivers would acquire on average sixteen kilos of cocaine, thirty to forty thousand pills (fentanyl) and/or kilo amounts of methamphetamine. During a typical trip to pick up drugs, the drivers would transport between $150,000 and $900,000 in U.S. currency to be supplied to the sources of supply. In return the drivers would be paid varying amounts for the trips.

Since the execution of the above referenced search warrants, several individuals have come forward and agreed to cooperate, hereafter referred to as Cooperating Defendant 1 (CD1) and Cooperating Defendant 2 (CD2). CD1 advised that CD1 advised that Co-Defendant Carlos RUELAS-Valdovinos "Compadre" introduced Defendant into the DTO to be one of the many interstate drug couriers in the spring of 2021. CD1 said Defendant was believed to be a Corrections Officer and lived outside of Tri-Cities, WA. CD1 further advised that Defendant made multiple trips to Arizona with Co-Defendant Joel CHAVEZ-Duran to transport money and acquire cocaine, methamphetamine and fentanyl laced pills. CD1 also advised that Defendant made several trips to California. CD1 subsequently identified Defendant through her Department of Corrections employment photograph. CD1 said before CHAVEZ-Duran was arrested, he gave Defendant a bag of leftover drugs and believed she still had it.

CD2 identified Defendant as one of the organization's bulk cash currency and drug couriers utilizing a white vehicle equipped with concealed compartments who traveled between Tri-Cities, WA and Arizona and California. CD2 advised that Defendant was a corrections officer and held that position during her involvement as a courier. CD2 advised that Defendant and another woman traveled to Tucson, AZ in July 2021 and acquired thirty pounds of methamphetamine and transported it back to Kennewick, WA. CD2 advised that in July 2021, Defendant received a bag containing

PLEA AGREEMENT - 21

30 pounds of methamphetamine, 10,000 pills and unknown amount of cocaine and was asked to hold onto it.

On March 14, 2022, DEA arrested Defendant at the Walla Walla State Penitentiary. Following her arrest, a post-Miranda interview was conducted. During the post-Miranda interview, Defendant admitted having acted as a driver for the organization on two occasions with Joel CHAVEZ Duran to Arizona and a third to California with Joel CHAVEZ' sister. Although Defendant initially believed she was only transporting money, Defendant stated she began to suspect drugs may be involved at which time she claimed to have stopped driving. Defendant said she was paid around $2,000 per trip.

Defendant said that about two weeks before Joel CHAVEZ-Duran was arrested, Joel called her and asked her to take a bag and hold onto it for a few days. Defendant agreed and met with Joel in Richland (WA) at which time a bag was provided to her by Joel. Defendant admitted the bag contained drugs, Following the post-Miranda interview, a consent search was conducted at Defendant's residence. The aforementioned bag was recovered and found to contain approximately 11 pounds of methamphetamine, 8,000 fentanyl laced pills and 1/2 pound of cocaine, and digital scale.

All drug seized were sent to the DEA laboratory for testing except for the marijuana. The results returned as follows: (1) Controlled Buy #1- positive for methamphetamine weighing 441.7 grams actual/pure at 98% purity; (2) Controlled Buy #1- approximately 250 pills confirmed to contain Fentanyl, weighing 26.95 grams; (3) Controlled Buy #2- positive for methamphetamine weighing 432.8 grams actual/pure at 96% purity; (4) Controlled Buy #3- approximately 1000 pills confirmed to contain Fentanyl, weighing 108.1 grams; (5) Defendant's bag- Exhibit 9: seven bags and packaging containing approximately 7,000 pills confirmed to contain 768.4 grams of fentanyl; (6) Exhibit 10 plastic bag confirmed to contain 221 grams of cocaine. The remaining reports are forthcoming.

PLEA AGREEMENT - 22

9.    The United States Agreements

The United States agrees not to bring any additional charges against Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in the Second Superseding Indictment unless Defendant breaches this Plea Agreement.

10.    United States Sentencing Guideline Calculations:

Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "USSG" or "Guidelines") apply and that the Court will determine Defendant's advisory range at the time of sentencing, pursuant to the Guidelines. The United States and Defendant agree to the following Guidelines calculations:

a.    *Base Offense Level and Relevant Conduct*:

The parties agree and stipulate that more than 4.5 KG of Methamphetamine (actual), was distributed in furtherance of the criminal activity jointly undertaken by the Defendant and her co-conspirators; this amount was within the scope of the Defendant's agreement; this amount was reasonably foreseeable to this Defendant in connection with the conspiracy; and this Defendant's relevant conduct for sentencing purposes should be calculated based upon this amount, pursuant to U.S.S.G. §1B1.3.

Therefore, the parties agree and stipulate that based upon the overall quantities of the various drugs involved, her base offense level is 38. *See* U.S.S.G. §2D1.1(c)(2) and Commentary 8(b).[4]

b.    *Special Offense Characteristics*:

Defendant is eligible for the safety valve provisions of 18 U.S.C. § 3553(f) and USSG §5C1.2. If the Court finds the Defendant has met the criteria set forth in 18

[4] The parties further agree and stipulate that if the Court were to convert into their marijuana equivalencies the amounts of methamphetamine, Fentanyl and cocaine seized, it would result in the same offense level.

PLEA AGREEMENT - 23

U.S.C. § 3553(f)(1)-(5), the Defendant is eligible to be sentenced without regard to the otherwise applicable mandatory minimum.

    c. *Role Adjustments*:

  The Defendant intends to seek a role adjustment.  The United States will oppose.

    d. *Acceptance of Responsibility*:

  The United States will recommend that Defendant receive a three-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a), (b), if Defendant does the following:

    i. accepts this Plea Agreement;

    ii. enters a guilty plea at the first Court hearing that takes place after the United States offers this Plea Agreement;

    iii. demonstrates recognition and affirmative acceptance of Defendant's personal responsibility for Defendant's criminal conduct;

    iv. provides complete and accurate information during the sentencing process; and

    v. does not commit any obstructive conduct.

  The United States and Defendant agree that at its option and on written notice to Defendant, the United States may elect not to recommend a reduction for acceptance of responsibility if, prior to the imposition of sentence, Defendant is charged with, or convicted of, any criminal offense, or if Defendant tests positive for any controlled substance.

    e. *No Other Agreements*:

  The United States and Defendant have no other agreements regarding the Guidelines or the application of any Guidelines enhancements, departures, or variances.  Defendant understands and acknowledges that the United States is free to make any sentencing arguments it sees fit, including arguments arising from

PLEA AGREEMENT - 24

Defendant's uncharged conduct, conduct set forth in charges that will be dismissed pursuant to this Agreement, and Defendant's relevant conduct.

      f.    *Criminal History*:

The United States and Defendant have made no agreement and make no representations as to Defendant's Criminal History Category, which shall be determined by the Court at sentencing after the Presentence Investigation Report is completed.

      10.   <u>Length of Incarceration</u>:

The parties are free to argue for any lawful sentence.

      11.   <u>Supervised Release</u>:

The United States and Defendant each agree to recommend 5 years of supervised release. Defendant agrees that the Court's decision regarding the conditions of Defendant's Supervised Release is final and non-appealable; that is, even if Defendant is unhappy with the conditions of Supervised Release ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or any term of Supervised Release.

The United States and Defendant agree to recommend that in addition to the standard conditions of supervised release imposed in all cases in this District, the Court should also impose the following conditions:

          (a). that Defendant participate and complete such drug testing and drug treatment programs as the Probation Officer directs, but not to exceed six non-treatment drug tests per month during the imposed term of supervised release; and

          (b). that Defendant's person, residence, office, vehicle, and belongings are subject to search at the direction of the Probation Officer.

//
//

PLEA AGREEMENT - 25

12.    Criminal Fine:

The United States and Defendant agree to recommend the Court impose no criminal fine. Defendant acknowledges that the Court's decision regarding a fine is final and non-appealable; that is, even if Defendant is unhappy with a fine ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or fine.

13.    Mandatory Special Penalty Assessment:

Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing, pursuant to 18 U.S.C. § 3013.

14.    Payments While Incarcerated:

If Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, Defendant agrees to earn money toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

15.    Additional Violations of Law Can Void Plea Agreement:

The United States and Defendant agree that the United States may, at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its sentencing recommendation if, prior to the imposition of sentence, Defendant is charged with or convicted of any criminal offense or tests positive for any controlled substance.

16.    Waiver of Appeal and Collateral Attack Rights:

Defendant understands that Defendant has a limited right to appeal or challenge Defendant's conviction and the sentence imposed by the Court.  Defendant expressly waives Defendant's right to appeal Defendant's conviction and/or sentence. Defendant also expressly waives Defendant's right to appeal any fine, term of supervised release, or restitution order imposed by the Court.

PLEA AGREEMENT - 26

Defendant expressly waives the right to file any post-conviction motion attacking Defendant's conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based on ineffective assistance of counsel arising from information not now known by Defendant and which, in the exercise of due diligence, Defendant could not know by the time the Court imposes sentence.

Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack upon the conviction or sentence, including, but not limited to, writ of habeas corpus proceedings brought pursuant to 28 U.S.C. § 2255.

17. <u>Compassionate Release:</u>

In consideration for the benefits Defendant is receiving under the terms of this Plea Agreement, Defendant expressly waives Defendant's right to bring any motion for Compassionate Release other than a motion arising from one of the specific bases set forth in this paragraph of this Plea Agreement. The United States retains the right to oppose, on any basis, any motion Defendant files for Compassionate Release.

The only bases on which Defendant may file a motion for Compassionate Release in the Eastern District of Washington are the following:

    a. *Medical Condition of Defendant*:

        i. Defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia; or

        ii. Defendant is suffering from a serious physical or medical condition, a serious functional or cognitive impairment, or deteriorating physical or mental health because of the aging

PLEA AGREEMENT - 27

process that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which Defendant is not expected to recover.

    b.    *Age of Defendant*:

        i.    Defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process; and has served at least 10 years or 75 percent of Defendant's term of imprisonment, whichever is less; or

        ii.    Defendant is at least 70 years old and has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which Defendant is imprisoned.

    c.    *Family Circumstances*:

        i.    The caregiver of Defendant's minor child or children has died or become incapacitated, and Defendant is the only available caregiver for Defendant's minor child or children; or

        ii.    Defendant's spouse or registered partner has become incapacitated, and Defendant is the only available caregiver for Defendant's spouse or registered partner.

    d.    *Subsequent Reduction to Mandatory Sentence*:

        i.    Defendant pleaded guilty to an offense which, on the date of Defendant's guilty plea, carried a mandatory minimum sentence; and

        ii.    after the entry of judgment, the length of the mandatory minimum sentence for Defendant's offense of conviction was reduced by a change in the law; and

      iii.     the application of the reduced mandatory minimum sentence would result in Defendant receiving a lower overall sentence.

    e.    *Ineffective Assistance of Counsel*:

      i.     Defendant seeks Compassionate Release based on a claim of ineffective assistance of counsel arising from information that Defendant both

        1.     did not know at the time of Defendant's guilty plea, and

        2.     could not have known, in the exercise of due diligence, at the time the Court imposed sentence.

18.    <u>Withdrawal or Vacatur of Defendant's Plea</u>:

Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction be set aside, vacated, reversed, or dismissed under any circumstance, then:

    a.    this Plea Agreement shall become null and void;

    b.    the United States may prosecute Defendant on all available charges;

    c.    the United States may reinstate any counts that have been dismissed, have been superseded by the filing of another charging instrument, or were not charged because of this Plea Agreement; and

    d.    the United States may file any new charges that would otherwise be barred by this Plea Agreement.

The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

Defendant agrees to waive any objections, motions, and/or defenses Defendant might have to the United States' decisions to seek, reinstate, or reinitiate charges if a

count of conviction is withdrawn, set aside, vacated, reversed, or dismissed, including any claim that the United States has violated Double Jeopardy.

Defendant agrees not to raise any objections based on the passage of time, including but not limited to, alleged violations of any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

19.    Integration Clause:

The United States and Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and Defendant, and no other promises, agreements, or conditions exist between the United States and Defendant concerning the resolution of the case.

This Plea Agreement is binding only on the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state, or local authorities.

The United States and Defendant agree that this Agreement cannot be modified except in a writing that is signed by the United States and Defendant.

Approvals and Signatures

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Vanessa R. Waldref
United States Attorney

_____          _5/9/23_____
Stephanie Van Marter                 Date
Assistant U.S. Attorney

PLEA AGREEMENT - 30

I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this. Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. My attorney has advised me that by pleading guilty to the charges relevant to this Plea Agreement, as of this date deportation appears to be a virtual certainty. No other promises or inducements have been made to me, other than those contained in this Plea Agreement, and no one has threatened or forced me in any way to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

_____          _____
LETICIA RODRIGUEZ                          Date 5/9/23
Defendant

I have read the Plea Agreement and have discussed the contents of the Plea Agreement with Defendant. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties. I have further advised my client by pleading guilty to the charges relevant to this Plea Agreement, as of this date deportation appears to be a virtual certainty. I concur in Defendant's decision to plead guilty as set forth in the Plea Agreement. There is no legal reason why the Court should not accept Defendant's plea of guilty.

_____          _____
Nicholas Marchi                            Date 5/9/23
Attorney for the Defendant

PLEA AGREEMENT - 31